## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on October 30, 2025**

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. |
| | : |
| v. | : GRAND JURY ORIGINAL |
| | : |
| ██████████ | : VIOLATIONS: |
| | : |
| and | : 18 U.S.C. § 371 |
| | : (Conspiracy) |
| ELENA VIRTANEN, | : |
| Defendants. | : 50 U.S.C. §§ 4819(a)(1) & (2)(A-G), 4819(b) |
| | : (Export Control Reform Act) |
| | : |
| | : 15 C.F.R. §§ 736.2(b)(1), 746.8(a)(1) & 764.2 |
| | : |
| | : 18 U.S.C. § 2 |
| | : (Aiding and Abetting) |
| | : |
| | : 18 U.S.C. § 554(a) |
| | : (Smuggling Goods from the United |
| | : States) |
| | : |
| | : 18 U.S.C. §§ 1343, 1349 |
| | : (Conspiracy to Commit Wire Fraud) |
| | : |
| | : Criminal Forfeiture: |
| | : 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. |
| | : § 982(a)(1); 28 U.S.C. § 2461(c); and 21 |
| | : U.S.C. § 853(p) |
| | : |
| | : **FILED UNDER SEAL** |
| | : |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At times material to this indictment:

### The Defendants and Relevant Parties

1.     Defendant ELENA VIRTANEN was a dual Finnish/Russian national and resident of Finland. She was the Chief Executive Officer of Finland PST Service Oy, also known as "PST Service Oy" (PST), based in Finland.

2.     As detailed below, from 2021 to 2023, PST purchased export-controlled goods from various U.S. companies and exported them to Russia without the required license. PST's website claimed that PST was "founded in 2004 by a group of highly trained experts in the fields of information and communication technology, marine electronics, and digital signal processing." The website claimed that PST "specializes in the manufacture of satellite communication/navigation devices and network-based devices" and that it "develops and produces its own production in-house." It further claimed to "manufacture high-quality marine electronics." PST's principal place of business was in Helsinki, Finland, in an apparent residential building.

3.     Defendant ███████████ was a Russian national residing in Russia. ███████ was associated with at least two Russian companies, including Russian Company 1, which was based in St. Petersburg, Russia.

4.     Hong Kong Company 1 was a company based in Hong Kong.

5.     Hong Kong Company 2 was a company based in Hong Kong.

6.     Turkish Company 1 was a company based in Turkey.

2

## Background

7.      Beginning in or around April 2021 and continuing through at least in or around April 2023, VIRTANEN, using her company, PST, conspired with ▆▆▆▆ and others to procure from the United States goods that required a license for export to Russia. ▆▆▆▆, VIRTANEN, and their coconspirators further caused or attempted to cause those products to be exported from the United States to Russia, through Finland, Hong Kong, and Turkey. ▆▆▆▆, VIRTANEN, and their coconspirators used wire communications in interstate and foreign commerce to further their scheme.

8.      ▆▆▆▆, representing companies in Russia (including Russian Company 1), and other conspirators placed orders with U.S. companies (U.S. Company A, U.S. Company B, and U.S. Company C) for export-controlled electronic components through PST, which acted as an intermediary, to obfuscate the end user of these items. Specifically, ▆▆▆▆ directed VIRTANEN to pay invoices for these items. VIRTANEN paid these invoices, provided false end user certifications for the orders (likely at ▆▆▆▆ direction), and then caused the items to be exported from the United States to Finland with the intent to ship them to entities in Hong Kong and Turkey for ultimate export to a customer in Russia.

9.      In procuring goods from the United States, ▆▆▆▆ VIRTANEN, and others intentionally concealed from the U.S. companies that the ultimate end users of the goods were Russian individuals and entities and that the ultimate destination of the goods was Russia. VIRTANEN, using PST, consolidated shipments, including shipments of export-controlled U.S.-origin electronic items, from Finland to Hong Kong and Turkey, ultimately destined for Russia.

10.     VIRTANEN and ▆▆▆▆ using PST, conspired to provide false information to U.S. companies through various means, causing those U.S. companies to file, online through the

Automated Export System (AES) portal maintained by the DOC, Bureau of Industry and Security (BIS) in Washington, D.C., materially false Electronic Export Information (EEI). Believing PST was acting in good faith, U.S. companies relied on information provided by PST to electronically file EEI that falsely listed PST as the ultimate consignee of the exports.

11. VIRTANEN and ▮▮▮▮ using PST, caused U.S. Company A to apply for export licenses for the export of goods to Finland, online through BIS's export license application portal maintained by BIS in Washington, D.C., using materially false information. Believing PST was acting in good faith, U.S. Company A relied on information provided by PST to electronically apply for these export licenses, falsely listing PST in Finland as the ultimate consignee of the exports.

12. As a result, goods procured from U.S. companies were unlawfully and fraudulently exported and reexported and attempted to be exported and reexported to Russia through Finland, Hong Kong, and Turkey.

13. At all relevant times, ▮▮▮▮ and VIRTANEN were aware of U.S. export control laws that prohibited the shipment of export-controlled goods from the United States to Russia without the required license. Notwithstanding that knowledge, at no time did ▮▮▮▮ VIRTANEN, or any of their coconspirators obtain a license from the BIS, which is located in Washington, D.C., to export any items described in this Indictment from the United States to Russia.

## STATUTES AND REGULATIONS

### The Export Control Reform Act and Export Administration Regulations

14.     The Export Control Reform Act (ECRA), 50 U.S.C. § 4801 *et seq.*, and the Export Administration Regulations (EAR), 15 C.F.R. Parts 730-774, restrict the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States.

15.     Through the EAR, the BIS reviews and controls the export of certain items from the United States to foreign destinations. See 15 C.F.R. §§ 734.2–734.3. BIS has placed restrictions on the export and reexport of items that the BIS has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end-user, and the end-use.

16.     The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

17.     The most sensitive items subject to EAR controls are identified on the Commerce Control List (CCL), which is set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items on the CCL are categorized by an Export Control Classification Number (ECCN), each of which has export control requirements depending on the final destination, end use, and end user.

18.     On February 24, 2022, in response to Russia's further invasion of Ukraine, the U.S. Department of Commerce imposed new license requirements on exports and reexports to Russia. As of that date, any item classified under any ECCN in Categories 3 through 9 of the CCL requires

a license to be exported to Russia. 87 Fed. Reg. 12226 (Mar. 3, 2022). As of April 8, 2022, license requirements for exports to Russia were expanded to cover all items on the CCL. 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. 746.8. Requests for licenses to export items on the CCL to Russia are reviewed under a policy of denial in all cases. 15 C.F.R. § 746.8(b). Items with ECCN 3A001 were export-controlled to Russia before February 2022; items with ECCN 7A994 were export-controlled to Russia beginning on February 24, 2022.

19.    Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to ECRA or the EAR. See 50 U.S.C. § 4819(a)(1), (b).

### Smuggling

20.    Section 305 of Title 13 of the Code of Federal Regulations provides that "[a]ny person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be [guilty of a crime]."

21.    Similarly, 15 C.F.R. § 30.71 provides that "[a]ny person . . . who knowingly fails to file or knowingly submits, directly or indirectly, to the U.S. Government, false or misleading export information through the AES, shall be [guilty of a crime]."

22.    The EEI (formerly known as the SED) is the required documentation submitted to the U.S. government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. An EEI also is required regardless of the value of the goods if the goods require an export license. 15 C.F.R. §§ 758.1, 30.2.

23.    A material part of the EEI and AES, as well as other export filings, is information concerning the end user and ultimate destination of the export. The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. government; (b) may be exported with the specific authorization or license from the U.S. government; or (c) may not be exported from the United States.

24.    EEI may be filed by the U.S. Principal Party of Interest (typically the exporter) online through the AES portal. Once submitted, the EEI is available to BIS for regulatory purposes.

25.    BIS uses export licenses to control the flow of sensitive goods and technologies from the United States for purposes of national security and foreign policy. Export license applications are reviewed by BIS officials based in Washington, D.C.

## JURISDICTION AND VENUE

26.    Pursuant to Title 18, United States Code, Section 3237, venue is proper in the District of Columbia.  Acts and omissions in furtherance of the offenses alleged in this Indictment occurred within the District of Columbia. Further, pursuant to Title 18, United States Code, Section 3238, the criminal offenses under investigation began or were committed elsewhere out of the jurisdiction of any particular state or district, and no offender is known to have, or have had, residence within any United States district.

## COUNT ONE

## CONSPIRACY

27.    From in or around November 2021 and continuing through at least in or around April 2023, in the District of Columbia and elsewhere, ███████████ and ELENA VIRTANEN did knowingly combine, conspire, confederate, and agree with each other and with

others both known and unknown to the Grand Jury, to commit the following offenses against the United States:

    a. To fraudulently and knowingly export and send and attempt to export and send from the United States merchandise, articles, and objects contrary to laws and regulations of the United States, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, before exportation, knowing the same to be intended for exportation contrary to the laws and regulations of the United States, in violation of Title 18, United States Code, Section 554; and

    b. To defraud the U.S. government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations relating to the export and reexport of items from the United States to Russia, by deceit, craft, trickery, and dishonest means.

### Objects of the Conspiracy

28.    The objects of the conspiracy were:

    a. To acquire U.S.-origin goods on the CCL—*i.e.*, electronic components that were manufactured and sold in the United States—on behalf of persons and entities in Russia;

    b. To export and reexport these goods from the United States to Russia and to Russian end users via Finland, Hong Kong, and Turkey;

    c. To conceal the prohibited activities and transactions from detection by the U.S. government so as to avoid penalties and disruption of the illegal activities;

    d. To profit from these illegal transactions; and

8

e.  To evade the prohibitions and licensing requirements of ECRA and the EAR.

## Manner and Means of the Conspiracy

29.      ████████ VIRTANEN, and other conspirators, known and unknown to the Grand Jury, used the following manner and means, among others, to accomplish the objects of the conspiracy:

a.  ████████ VIRTANEN, and other conspirators known and unknown to the Grand Jury would, by deceit, craft, trickery, and dishonest means, defraud the United States by interfering with and obstructing the lawful governmental functions of the U.S. Department of Commerce, in that they would willfully export, reexport, and cause the exportation and reexportation of goods on the CCL—and attempt to do the same—from the United States to Russia in violation of U.S. export control and sanctions laws without first having obtained the required licenses from the U.S. Department of Commerce;

b.  It was part of the conspiracy that VIRTANEN, to fulfill orders from Russian customers, would purchase U.S.-origin goods on the CCL from companies in the United States, including U.S. Company A, U.S. Company B, and U.S. Company C, by providing false information about the end user of the goods to the U.S. companies when that information was requested;

c.  It was further part of the conspiracy that the conspirators would exchange pricing quotations and negotiate with each other for the procurement of the U.S.-origin goods on behalf of persons and entities in Russia;

d.  It was further part of the conspiracy that the conspirators would use email, messaging applications, and other means to communicate about the orders that the

conspirators intended to be shipped to Russia and how to conceal that such orders would be shipped to Russia;

e. It was further part of the conspiracy that ███████ and VIRTANEN would share account and login information to purchase the U.S.-origin goods on the CCL and to track shipment of these items;

f. It was further part of the conspiracy that VIRTANEN would arrange for shipment of the goods from the United States to her company in Finland, PST, to conceal that the true end users and end destinations were in Russia;

g. It was further part of the conspiracy that VIRTANEN would transfer funds originating from Russian Company 1, Hong Kong Company 1, Hong Kong Company 2, and Turkish Company 1 for the purchase and shipment of the goods through an international money exchange service to bank accounts in Germany associated with U.S. Companies A, B, and C; and

h. It was further part of the conspiracy that VIRTANEN would repackage the shipments and reexport them to persons and entities in Hong Kong and Turkey, with the ultimate destination of Russia, without first obtaining the necessary licenses and authorizations from the U.S. Department of Commerce.

### Overt Acts

30. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of Columbia and elsewhere:

**PST Enters Into Contracts with Russian Company 1 and Companies in Hong Kong and Turkey**

a. On or about April 14, 2021, PST and Russian Company 1 entered into a contract. The contract was numbered 211404 and was signed by VIRTANEN and Russian

Company 1's General Director. On or about November 18, 2021, ▆▆▆▆ emailed Russian Person 1 a copy of this contract.

b. On or about June 15, 2021, PST and Hong Kong Company 1 entered into a contract. The contract was signed by VIRTANEN, representing PST as its "CEO," and a representative of Hong Kong Company 1.

c. On or about April 26, 2022, PST and Hong Kong Company 2 entered into a contract. The contract was signed by VIRTANEN, representing PST as its "CEO," and a representative of Hong Kong Company 2. ▆▆▆▆ emailed VIRTANEN a copy of this contract on or about April 26, 2022.

d. On or about September 20, 2022, PST and Turkish Company 1 entered into a contract. The contract was signed by VIRTANEN, representing PST as its "CEO," and a representative of Turkish Company 1. On or about September 21, 2022, ▆▆▆▆ emailed VIRTANEN a copy of this contract.

**▆▆▆▆ and VIRTANEN Establish PST's Involvement in Russian Procurement Activity and Arrange Logistics**

e. On or about May 26, 2021, ▆▆▆▆ emailed VIRTANEN, requesting VIRTANEN register the domain "pstservice.com" in Finland "so as to minimize the exposure of the Russian Federation."

f. On or about June 4, 2021, ▆▆▆▆ emailed Russian Person 2, who appeared to be developing PST's website. ▆▆▆▆ provided Russian Person 2 text, in English, very similar to language found on PST's website.

g. On or about October 29, 2021, ▆▆▆▆ emailed VIRTANEN requesting that VIRTANEN create an account with an international shipping company (International Shipping Company 1).

11

**Unlawful Export of 19 ECCN 3A001 Amplifiers on November 8, 2021**

h.  On or about September 3, 2021, ███████ VIRTANEN, or one of their coconspirators caused U.S. Company A to send a quote for two quantities (19 and 3,000) of export-controlled part number TGA2704 (high power amplifiers). The amplifiers were export restricted and on the CCL with ECCN 3A001.b.2.b. and required a license for export to Russia.

i.  On or about September 7, 2021, ███████ or VIRTANEN submitted to U.S. Company A an End User Statement for 19 TGA2704 amplifiers. The End User Statement claimed that PST was the ultimate consignee for the items and that the intended end use was in marine electronics manufacturing.

j.  On or about September 24, 2021, and based on the information provided by PST in this End User Statement, the conspirators caused U.S. Company A to apply for an export license through the online export license application portal maintained by BIS, located in Washington, D.C., to ship the amplifiers to PST in Finland; BIS approved this license on or about October 26, 2021.

k.  On or about November 2, 2021, ███████ asked VIRTANEN to pay an invoice from U.S. Company A and to create an invoice for Russian Company 1 for 19 units (or "pieces") of the TGA2704 amplifiers described above.

l.  On or about November 3, 2021, VIRTANEN caused PST to pay U.S. Company A approximately $2,359 for the order through an international money exchange service to a bank account in Germany associated with U.S. Company A.

m.  On or about November 8, 2021, the conspirators caused U.S. Company A to export the 19 amplifiers to PST.

n.  On or about November 8, 2021, the conspirators caused U.S. Company A to file false EEI declaring PST in Finland as the ultimate recipient of the shipment.

o.  On or about December 13, 2021, VIRTANEN emailed ▉▉▉▉ an international waybill listing the brand name and part number of the amplifiers and indicating they were shipped from PST in Finland to Russian Company 1 in Russia.

### Unlawful Attempted Export of Two ECCN 3A001 Amplifiers in October-December 2021

p.  On or about October 22, 2021, ▉▉▉▉ VIRTANEN, or one of their coconspirators caused U.S. Company A to issue a quote for two units of export-controlled part number AMM-7199SM (amplifiers). The amplifiers were export restricted with ECCN 3A001.b.2.d. and required a license for export to Russia.

q.  On or about October 28, 2021, ▉▉▉▉ or VIRTANEN submitted to U.S. Company A an End User Statement for two AMM-7199SM amplifiers. The End User Statement claimed that PST was the ultimate consignee for the items and that the intended end use was in marine electronics manufacturing.

r.  On or about November 2, 2021, VIRTANEN caused PST to pay U.S. Company A approximately $280 for the order through an international money exchange service to a bank account in Germany associated with U.S. Company A.

s.  On or about October 29, 2021, and based on the information provided by PST in the End User Statement, the conspirators caused U.S. Company A to apply for a BIS export license through the online export license application portal maintained by BIS, located in Washington, D.C., to ship the amplifiers to PST; BIS approved this license on or about December 2, 2021.

t.  On or about December 3, 2021, VIRTANEN caused PST to agree to the conditions listed in the BIS export license, including prohibitions on unauthorized reexports to a third country.

u.  On or about December 28, 2021, VIRTANEN emailed ███████ an invoice on PST letterhead addressed to Russian Company 1 for the two AMM-7199SM amplifiers. The invoice referenced contract number 211404 (described above).

### Unlawful Attempted Export of 3,000 ECCN 3A001 Amplifiers in November 2021-January 2022

v.  On or about November 8, 2021, ████████ emailed VIRTANEN requesting that VIRTANEN prepare an invoice for 3,000 units of the same amplifiers for which U.S. Company A had already quoted PST.

w.  On or about November 24, 2021, VIRTANEN caused PST to pay U.S. Company A approximately $94,995.99 through an international money exchange service to a bank account in Germany associated with U.S. Company A.

x.  On or about December 6, 2021, VIRTANEN caused PST to issue a purchase order to U.S. Company A for 3,000 units of TGA2704 amplifiers.

y.  On or about December 28, 2021, VIRTANEN emailed ███████ invoice no. 2372, which was addressed to Russian Company 1 for 3,000 units of TGA2704 amplifiers; the invoice totaled approximately 177,000 euros.

z.  On or about January 11, 2022, VIRTANEN sent an email to ██████ describing how U.S. Company A would "not be able to support our project," explaining, "He didn't say it straight out, but the underlying message was that Finland PST Service Oy helps sanctioned countries."

14

aa. On or about January 13, 2022, ████████ emailed VIRTANEN, asking her to send an email, in English, to the manufacturer of the TGA2704 amplifiers asking the manufacturer to support PST's project and sell/ship the 3,000 units PST had sought from U.S. Company A. ████████ wrote in part, "(i)t's best to email it from Finland, everyone has gotten wise and VPN doesn't always conceal the sender's Ip address."

bb. In or around February 2022, after U.S. Company A refused further business from PST, ████████ emailed VIRTANEN a letter from Russian Company 1 canceling invoice no. 2372, which was Russian Company 1's order of the 3,000 units of the amplifiers described above.

**Unlawful Attempted Export of 105 ECCN 3A001 Amplifiers in January 2022**

cc. On or about January 20, 2022, ████████ emailed VIRTANEN stating, "We decided to buy a few pieces from [a second U.S. company, U.S. Company B]. Please pay." Attached to the email were two invoices issued by U.S. Company B, one for 90 units of the TGA2704 export-controlled amplifiers described above and the other for 15 units of the same amplifiers.

dd. On or about January 21, 2022, VIRTANEN caused PST to transfer two payments to U.S. Company B to pay for the respective invoices, totaling approximately 12,413 euros. These payments were made through an international money exchange service to a bank account in Germany associated with U.S. Company B.

**Unlawful Export of 15 ECCN 3A001 Integrated Circuits and
11 ECCN 7A994 Antennas on March 31, 2022**

ee. On or about March 23, 2022, ████████ emailed VIRTANEN asking her to pay an attached invoice from U.S. Company C for 15 units of part no. 71256S70TDB

(integrated circuits). These items were export-controlled with ECCN 3A001.a.2.c. and required a license for export to Russia.

ff. On or about March 24, 2022, VIRTANEN caused PST to pay U.S. Company C approximately 320 euros for 15 units of part no. 71256S70TDB (integrated circuits). This payment was made through an international money exchange service to a bank account in Germany associated with U.S. Company C.

gg. On or about March 30, 2022, ▮▮▮▮▮ emailed VIRTANEN asking her to pay an invoice for the purchase of 11 antennas from U.S. Company C. The items were export-controlled with ECCN 7A994 and required a license for export to Russia.

hh. On or about March 30, 2022, VIRTANEN caused PST to pay U.S. Company C approximately 764 euros for the 11 ECCN 7A994 antennas through an international money exchange service to a bank account in Germany associated with U.S. Company C.

ii. On or about March 22, 2022, and March 31, 2022, VIRTANEN caused U.S. Company C to export the 15 integrated circuits and 11 antennas described above to PST in Finland, respectively.

jj. On or about April 12, 2022, ▮▮▮▮▮ emailed VIRTANEN an invoice on PST letterhead addressed to Russian Company 1 in St. Petersburg, Russia. The invoice noted contract number 211404 (discussed above). This invoice listed the 15 integrated circuits and 11 antennas, among other items.

kk. On or about April 14, 2022, VIRTANEN caused International Shipping Company 1 to ship the 15 ECCN 3A001 integrated circuits and 11 ECCN 7A994 antennas to Hong Kong Company 1 in Hong Kong.

ll.    On or about April 19, 2022, VIRTANEN emailed ███████ a document from International Shipping Company 1 showing the shipment to Hong Kong Company 1.

mm.    On or about October 24, 2022, ███████ emailed to VIRTANEN the signed contract between Hong Kong Company 1 and PST described in para. 30(b).

**Unlawful Export of 1,000 ECCN 7A994 Global Navigation Satellite System Antenna Modules on November 29, 2022**

nn. On or about November 29, 2022, VIRTANEN caused PST to purchase 1,000 units of CAM-M8Q Global Navigation Satellite System (GNSS) antenna modules from U.S. Company C. These items were export-controlled under ECCN 7A994 and required a license for export to Russia.

oo. On or about November 29, 2022, VIRTANEN and other conspirators caused U.S. Company C to export 1,000 units of CAM-M8Q, among other items, to PST in Finland.

pp. On or about November 29, 2022, the conspirators caused U.S. Company C to file erroneous EEI declaring PST in Finland as the ultimate recipient of the shipment.

qq. On or about January 26, 2023, ███████ emailed VIRTANEN, asking her to pay 20,000 euros to U.S. Company C related to the purchase of CAM-M8Q GNSS antenna modules and other items.

rr. On or about February 17, 2023, VIRTANEN and other conspirators caused 1,000 units of CAM-M8Q GNSS antenna modules to be shipped to Turkish Company 1 in Turkey.

ss. On or about April 3, 2023, ███████ and other conspirators caused the 1,000 units of CAM-M8Q GNSS antenna modules to be imported into Russia.

17

**Failure to Obtain a License**

tt. At no time did any of the conspirators apply for or obtain the required authorization or license from the U.S. Department of Commerce, which is located in the District of Columbia, for the shipment of the above-mentioned export-controlled goods to Russia.

(**Conspiracy to Commit an Offense Against the United States and to Defraud the United States**, in violation of Title 18, United States Code, Section 371)

## COUNTS TWO THROUGH EIGHT

31. The allegations in Paragraphs 1 through 26 and 28 through 30 of this Indictment are incorporated and realleged by reference.

32. On or about the dates listed below, Defendant ████ and Defendant VIRTANEN, together with others known and unknown to the Grand Jury, within the venue of the U.S. District Court for the District of Columbia, did knowingly and willfully export and reexport, attempt to export and reexport, and cause to be exported and reexported from the United States to Russia goods and technology on the Commerce Control List set forth in Title 15, Code of Federal Regulations, part 774, Supplement No. 1, as described in each Count below, without having first obtained a license for such export from the U.S. Department of Commerce, which is located in the District of Columbia, and aided and abetted the same, as follows:

| COUNT | APPROXIMATE DATE OF EXPORT/ATTEMPTED EXPORT | ITEM & CLASSIFICATION |
|---|---|---|
| 2 | November 8, 2021 | 19 High Power Amplifiers (ECCN 3A001.b.2.b.) |
| 3 | October-December 2021 | 2 Surface Mount Amplifiers (ECCN 3A001.b.2.d.) |
| 4 | November-December 2021 | 3,000 High Power Amplifiers (ECCN 3A001.b.2.b.) |
| 5 | January 2022 | 105 High Power Amplifiers (ECCN 3A001.b.2.b.) |

| 6 | March 22, 2022 | 15 Integrated Circuits (ECCN 3A001.a.2.c.) |
| 7 | March 31, 2022 | 11 Antennas (ECCN 7A994) |
| 8 | November 29, 2022 | 1,000 Antennas (ECCN 7A994) |

(**Export Control Reform Act**, in violation of Title 50, United States Code, Section 4819(a)(1) & (2)(A-G) and (b); and Title 15, Code of Federal Regulations, Sections 736.2(b)(1), 746.8(a)(1), and 764.2; and **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2))

## COUNTS NINE THROUGH FIFTEEN

33.    The allegations in Paragraphs 1 through 26 and 28 through 30 of this Indictment are incorporated and realleged by reference.

34.    On or about the dates listed below, Defendant ███████ and Defendant VIRTANEN, together with others known and unknown to the Grand Jury, within the venue of the U.S. District Court for the District of Columbia, did knowingly and fraudulently export and send and attempt to export and send the merchandise, articles, and objects listed below from the United States contrary to laws and regulations of the United States, to wit, Title 50, United States Code, Sections §§ 4801-4852; and Title 15, Code of Federal Regulations, Parts 730-774; Title 13, United States Code, Section 305; and Title 15, Code of Federal Regulations, Part 30, and fraudulently and knowingly receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, knowing the same to be intended for exportation contrary to such laws and regulations of the United States as follows:

| COUNT | APPROXIMATE DATE OF EXPORT/ATTEMPTED EXPORT | ITEM & CLASSIFICATION |
| --- | --- | --- |
| 9 | November 8, 2021 | 19 High Power Amplifiers (ECCN 3A001.b.2.b.) |
| 10 | October-December 2021 | 2 Surface Mount Amplifiers (ECCN 3A001.b.2.d.) |
| 11 | November-December 2021 | 3,000 High Power Amplifiers (ECCN 3A001.b.2.b.) |

| 12 | January 2022 | 105 High Power Amplifiers (ECCN 3A001.b.2.b.) |
| 13 | March 22, 2022 | 15 Integrated Circuits (ECCN 3A001.a.2.c.) |
| 14 | March 31, 2022 | 11 Antennas (ECCN 7A994) |
| 15 | November 29, 2022 | 1,000 Antennas (ECCN 7A994) |

(**Smuggling goods from the United States**, in violation of Title 18, United States Code, Section 554(a)); and **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2).

## COUNT SIXTEEN

35.    The allegations in Paragraphs 1 through 26 and 28 through 30 of this Indictment are incorporated and realleged by reference.

36.    From at least in or around April 2021 and continuing through at least in or around April 2023, Defendant ▮▮▮▮▮ and Defendant VIRTANEN, within the venue of the U.S. District Court for the District of Columbia, did knowingly combine, conspire, and agree with each other and with others known and unknown to the Grand Jury to devise a scheme to defraud U.S. companies through the transmission of materially false representations, namely, false representations concerning the end use, end user, and destination of the goods purchased from and exported by the U.S. companies, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing this scheme caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described in this indictment.

(**Conspiracy to Commit Wire Fraud**, in violation of Title 18, United States Code, Sections 1343 and 1349)

20

## FORFEITURE ALLEGATIONS

37.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of violations of Smuggling, Title 18, United States Code, Section 554; as alleged in Counts Nine through Fifteen of this Indictment, Defendant ████ and Defendant VIRTANEN shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, that constitutes, or is derived from, proceeds traceable to these offenses.

38.    Pursuant to Title 18, United States Code, Section 982(a)(1), on conviction of an offense in violation of Title 18, United States Code, Section 1349, as alleged in Count Sixteen of this Indictment, Defendant ████ and Defendant VIRTANEN shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, that constitutes, or is derived from, proceeds traceable to this offense.

39.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

     a.   cannot be located upon the exercise of due diligence;
     b.   has been transferred, sold to, or deposited with a third party;
     c.   has been placed beyond the jurisdiction of the Court;
     d.   has been substantially diminished in value; or
     e.   has been commingled with other property that cannot be divided without difficulty,

Defendant ████ and Defendant VIRTANEN shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

> (**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 28, United Sates Code, Section 2461(c); Title 18, United States Code, Section 982(a)(1); and Title 21, United States Code, Section 853(p))

A TRUE BILL

_____

Foreperson

JEANINE FERRIS PIRRO
United States Attorney

By:
 MICHAEL DILORENZO
 Acting Deputy Chief,
 National Security Section